CHAS. N. MANNING, LOUIS DES COGNETS, SR., AND GEO. K. GRAVES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 8111–8113.    Promulgated June 14, 1927.

The unextinguished cost of buildings removed in order to obtain a 99-year lease upon the land represented the cost to the lessor of such lease and should be exhausted over the term of the lease.

*Jesse I. Miller, Esq.,* and *W. A. Hifner, Jr., C. P. A.,* for the petitioners.

*J. E. Marshall, Esq.,* for the respondent.

The Commissioner determined deficiencies for the year 1921 of $2,229.45 against Chas. N. Manning, $1,971.69 against Louis des Cognets, Sr., and $1,527.08 against Geo. K. Graves.

Petitioners each claimed a deduction of one-third of the unextinguished cost of certain buildings purchased in equal interests in March, 1920, and demolished between November 1 and December 31, 1921.

The Commissioner held that in view of the short period of time intervening between the acquisition of the real estate and the date on which the property was leased for 99 years, and the buildings located thereon were demolished, the petitioners were not entitled to any deduction as a loss under the provisions of article 142 of Regulations 62, providing that when a taxpayer buys real estate upon which is located a building which he proceeds to raze with the view of erecting thereon another building, the value of the real estate exclusive of all improvement is presumed to be equal to the purchase price of the land and buildings, and, accordingly, denied the deduction claimed by petitioners.

The proceedings were consolidated for hearing and decision.

### FINDINGS OF FACT.

Petitioners are residents of Lexington, Ky. For some time prior to 1920 they each had made a practice of investing money in real property in Lexington. In March, 1920, Chas. N. Manning and Geo. K. Graves owned certain property on Main Street in the City of Lexington. On March 28, 1920, petitioners purchased in equal interest certain property designated as 208–212 East Main Street, Lexington, adjoining the property owned by Manning and Graves for $81,638; $26,000 of this amount represented the cost allocable to the buildings upon a portion of the property, consisting of a two-story brick grocery store with rooms above, and a one-story brick

garage. At the time this property was purchased, the store building and garage were under lease at a gross rental of $3,300 per annum. After the purchase petitioners increased the gross rental to $4,200 a year. Manning and Graves were interested in acquiring this property because it adjoined certain property which they already owned and they interested des Cognets in joining them in the transaction.

At the time of the purchase, petitioners had no definite plans in mind in respect of any particular use to which they would devote the property other than to rent the buildings upon it. This property was within a short distance of and on the same street as the principal hotel in Lexington, and petitioners felt that in time the business section of the city would develop in that direction and that, if it should, this property would become very valuable. The property was purchased purely as an investment. Petitioners had no idea what they were going to do with the property at the time they purchased it. Some time after the purchase petitioners heard that the owners of the hotel near this property were considering the erection of an annex and an effort was made to interest these parties in this property. Nothing further developed concerning this. Subsequently, the building of the principal department store in Lexington burned and petitioners approached the management of the concern relative to the acquisition of this property for the new location of their store. These negotiations were fruitless. Thereafter there was talk that the City of Lexington would erect a new city hall and auditorium and petitioners endeavored to have the city acquire this property for that purpose. They were not successful in these efforts.

Prior to October, 1921, petitioners learned that certain persons in Louisville, Ky., were contemplating the organization of a corporation to operate a chain of theatres, whereupon Graves went to Louisville and conferred with one of these gentlemen with a view of interesting him in the acquisition of the property owned by him and the other petitioners. This individual came to Lexington and examined their property, but gave petitioners no indication at that time that he was interested in the premises. Later he opened negotiations with petitioners to lease the property for 99 years and to erect thereon a theatre building. On October 31, 1921, the parties reached satisfactory terms and on that date petitioners leased the land to the Lafayette Amusement Co., a corporation, for a term of 99 years from November 1, 1921. The lessee agreed to and did in November and December, 1921, remove the buildings situated upon the property in consideration of the salvage obtained therefrom. The lease provided that the lessee would erect upon the whole of the land a theatre building at a cost of not less than $150,000, to be completed

not later than December 31, 1922, and pay all taxes, insurance, and the cost of all repairs and upkeep of the buildings, unless the lease should become forfeited for failure to make payments as therein specified. The lease provided that in the event of forfeiture the buildings should become the property of the lessor and all rights of the lessee thereunder should cease in the event it should not redeem the property within the time specified in the lease by the discharge of all defaulted payments. The lease further provided that the lessee should pay no rental from November 1, 1921, to April 30, 1922, and that, thereafter, the annual rental should be—

$4,800.00 from May 1, 1922, to October 31, 1931.
6,400.00 from Nov. 1, 1931, to October 31, 1941.
7,040.00 from Nov. 1, 1941, to October 31, 1951.
7,744.00 from Nov. 1, 1951, to October 31, 1961.
8,588.50 from Nov. 1, 1961, to October 31, 1971.
9,370.24 from Nov. 1, 1971, to October 31, 1981.
10,307.26 from Nov. 1, 1981, to October 31, 1991.
11,337.98 from Nov. 1, 1991, to October 31, 2001.
12,471.77 from Nov. 1, 2001, to October 31, 2011.
13,718.94 from Nov. 1, 2011, to October 31, 2020.

The lessee was given the option to purchase the land at any time during the term of the lease or prior to forfeiture thereof for $133,-333 cash.

The reasonable allowance for the exhaustion, wear and tear of the buildings upon this property for the years 1920 and 1921 was 3 per cent per annum.

#### OPINION.

LITTLETON: The sole question for decision in this case is whether the petitioners are entitled to a loss, on account of the voluntary demolition of certain buildings, under the provisions of section 214(a)(5) of the Revenue Act of 1921, which reads as follows:

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business * * *.

While the Commissioner, in his notice of deficiency, denied the loss as not satisfying the provisions of article 142, Regulations 62, yet in his answer to the petition, he says that the loss is not allowable since the petitioners were compensated for any loss suffered by them through the demolition of the buildings.

In this latter contention, we are constrained to concur. Prior to the execution of the lease the petitioners held certain property which they had purchased for investment purposes without any definite idea of the manner of its utilization other than that they, as prudent business men, would use it to their advantage. From March, 1920,

until October 31, 1921, they derived income from the property through the rental of the buildings. After several fruitless attempts to make a satisfactory sale or lease of the property, a 99-year lease was executed for the land under which the lessee agreed to erect a building thereon, costing not less than $150,000, and to pay a net rental in excess of that which the petitioners were receiving from the structures already located on the land.

While no provision was made in the lease as to the buildings then on the land, the very nature of the building to be erected made it necessary for the existing structures to be torn down. The razing of the buildings was agreed upon at the time of the execution of the lease. The petitioners gave the lessee the option of tearing down the old buildings and retaining the salvage as compensation for its work in their destruction, or the petitioners agreed to demolish them and keep the salvage. The lessee agreed to demolish and remove the buildings on the terms offered. The cost to petitioners allocable to these structures which were demolished was $26,000. The question is whether a deductible loss of this cost less depreciation was sustained through demolition.

Prior to the execution of the lease the petitioners had land and buildings from which they were deriving income in the form of rent, and also land. After the execution of the lease, they had only the land and were lessors under a more advantageous lease than they formerly had. Did they part with the buildings, without receiving compensation therefor, *quid pro quo?* That the lease in question was a favorable one is admitted by the petitioners and that they improved their position thereby is shown by the fact that their rentals were substantially greater under the new lease than those being received prior to October 31, 1921, from the old buildings. But the petitioners say that they could not have been compensated in 1921 under the lease for the loss since they did not begin to receive rentals thereunder until 1922. We are not impressed by the logic of this argument. The acquisition of something from which income will be derived *in futuro* has a value in money's worth in the same sense as something which will produce income *in praesenti*. The value may differ on this account, but this does not alter the fact that each has a compensating value which may be recognized as having money's worth.

Taken by itself, the petitioners undoubtedly would be said to have sustained a loss in the demolition of their buildings, but when considered in connection with the entire transaction entered into on October 31, 1921, the Board is of the opinion that the removal of the buildings was fully compensated for in the rights acquired under the lease and that the cost of the buildings, less sustained depreciation,

is properly allocable to the cost of securing the lease. In other words, there was in this instance what amounted to a substitution of assets; instead of an asset in the form of buildings, the petitioners now have another asset, viz., a lease, the giving up or voluntary destruction of the buildings being a necessary incident to the acquisition of the lease.

Since, however, the lease acquired had a definite life of 99 years, the cost of the buildings, less sustained depreciation, which entered into securing the lease, are properly amortizable over the life of the lease, and a deduction from gross income should be allowed under the provisions of section 214(a) (8) of the Revenue Act of 1918, for the exhaustion of this asset over a 99-year period from the date the lease was signed. *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169.

*Judgment will be entered on 10 days' notice, under Rule 50.*

MILLIKEN not participating.